UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>RICHARD FREDERICK DIXON,<br><br>    Defendant. | Case No. 72-46674<br>Honorable Laurie J. Michelson |

## ORDER DENYING WITHOUT PREJUDICE DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE [2]

Richard Dixon is 82 years old. He has been incarcerated since 1976. He served over 45 years of a life sentence on a state conviction for second-degree murder until he was granted parole on April 9, 2021. He was subsequently transferred to federal custody on May 19, 2021, to begin serving a 40-year consecutive sentence for convictions arising out of his 1972 hijacking of a commercial airplane.

Throughout his incarceration, Dixon remained in relatively good health until contracting COVID-19 at the onset of the pandemic. Since then, he says, his health has deteriorated. He is now suffering from vertigo, a chronic skin condition, and an injury to his hip and head following a fall. Dixon does not believe the Bureau of Prisons can manage his health conditions as he ages. The government is sympathetic to Dixon's plight—to a point. But it has provided hundreds of pages of medical records to demonstrate that Dixon actively receives medical treatment and care from the BOP. Thus, says the government, there is no extraordinary and compelling reason to

justify Dixon's immediate release. At this time, the Court agrees. Thus, Dixon's motion is DENIED.

## I.

On October 9, 1971, "Dixon, armed with a revolver, seized a flight attendant who was assisting boarding passengers on an Eastern Airlines jet at the Detroit Metropolitan Airport. Dixon then ordered the pilot to fly the plane to Cuba. Dixon apparently remained in Cuba for some time after the hijacking." *Dixon v. United States*, 592 F.2d 329, 331 (6th Cir. 1979).

Eventually, Dixon returned to Michigan. In the early morning hours of January 9, 1976, a police officer responded to a shots-fired call. (ECF No. 2, PageID.12.) He encountered Dixon and attempted to frisk him. (*Id.*) But Dixon shot the officer twice, killing him. (*Id.*) Dixon tried to shoot the backup officer as well, but his firearm malfunctioned. (*Id.*) Dixon was ultimately convicted of second-degree murder following a jury trial in Michigan state court on July 29, 1976. *People v. Dixon*, 270 N.W.2d 488, 490 (Mich. Ct. App. 1978). He was sentenced to life in prison on September 10, 1976. *Dixon*, 592 F.2d at 332.

In the meantime, Dixon's federal charges of air piracy, in violation of 49 U.S.C. § 1472(i), and kidnapping, in violation of 18 U.S.C. § 1201(a), had remained pending. On December 16, 1976, Dixon was convicted on both counts following a jury trial. *Id.* at 333. He was "sentenced to twenty-year terms of incarceration on each count of the indictment, the sentences to run consecutively and consecutive to the life sentence

Dixon received for his second-degree murder conviction in Michigan Circuit Court." *Id*.

In April 2020, at the onset of the coronavirus pandemic, Dixon contracted COVID-19. (ECF No. 2, PageID.18.) He was hospitalized for four months. (*Id.*) Less than a year later, and despite Dixon's life sentence, the Michigan parole board granted him parole on April 9, 2021. (ECF No. 2, PageID.13.) Dixon was 80 years old. He was then placed into federal custody at USP Hazelton in West Virginia to begin serving his 40-year consecutive sentence on May 19, 2021. (*Id.*)

After serving a little more than two years of his federal sentence, Dixon now seeks compassionate release under 18 U.S.C. § 3582(c)(1)(A). (ECF No. 2.) He says he is suffering from long-COVID, vertigo, and an undiagnosed skin condition that has resulted in his skin rupturing. (*Id.*) And he recently fell, injuring his head and his hip. (*Id.*) According to Dixon, "[h]is deteriorating condition cannot be managed in the BOP as he advances into his eighties." (*Id.* at PageID.9.)

The government opposes the request. (ECF No. 8.) "The government is sympathetic to Dixon's circumstances and also wants to ensure that he will receive proper medical care as he ages and battles any illness." (ECF No. 8, PageID.88.) But, continues the government, Dixon's "medical records indicate that he has received, and continues to receive, comprehensive medical treatment while in BOP custody." (*Id.*) To date, this appears to be true. (*See* ECF Nos. 9-6, 9-7 (sealed).) Having reviewed the briefing and Dixon's medical records, the Court finds that the motion can be decided without further argument. *See* E.D. Mich. LR 7.1(f)(1).

II.

Any reduction in an inmate's sentence, no matter his or her age, is a rare remedy. Indeed, a district court generally "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c). One exception to this rule is compassionate release.

The compassionate release statute allows the Court to reduce a defendant's sentence if it finds, after a defendant has exhausted his administrative remedies or upon the lapse of 30 days from the receipt by the warden of a request for compassionate release, that (1) "extraordinary and compelling reasons" warrant a reduction; (2) a reduction is "consistent with applicable policy statements issued by the Sentencing Commission"; and (3) the sentencing factors under 18 U.S.C. § 3553(a), to the extent they apply, support a reduction. 18 U.S.C. § 3582(c)(1)(A); *see United States v. Ruffin*, 978 F.3d 1000, 1005 (6th Cir. 2020). Presently, "[i]n cases where incarcerated persons file motions for compassionate release, federal judges may skip step two of the § 3582(c)(1)(A) inquiry and have full discretion to define 'extraordinary and compelling' without consulting the policy statement § 1B1.13." *United States v. Jones*, 980 F.3d 1098, 1111 (6th Cir. 2020). Without an "extraordinary and compelling" reason, the district court may not grant compassionate release. *See United States v. Hunter*, 12 F.4th 555, 572 (6th Cir. 2021).

A.

The First Step Act's exhaustion requirement is mandatory. *United States v. Alam*, 960 F.3d 831, 832 (6th Cir. 2020).

Dixon initially sought compassionate release from the Hazelton Warden on April 23, 2022, based only on his age and the length of time spent in prison. (ECF No. 9-2.) The Warden denied the request on June 10, 2022. (ECF No. 9-3.) Dixon's counsel then submitted another request to the Warden on October 23, 2022, this time claiming "Dixon's advanced age and current health condition" presented an extraordinary and compelling reason for a sentence reduction. (ECF No. 9-4 (sealed).) The Warden disagreed and denied this request as well. (ECF No. 9-5 (sealed).) He told Dixon "[w]hile you are of an advanced age and suffer some age-related conditions, your provider has determined that it does not substantially impair your ability to function in a correctional environment." (*Id.*)

Based on this correspondence, the government agrees that Dixon has satisfied the exhaustion requirement. (ECF No. 8, PageID.77.)

**B.**

The next hurdle is whether Dixon has an extraordinary and compelling reason to end his sentence more than 35 years early.

District courts have defined an "extraordinary and compelling reason" as "one that is 'beyond what is usual, customary, regular, or common,' and is 'so great that irreparable harm or injustice would result if [the relief] is not granted.'" *United States v. Powell*, No. 21-1262, 2021 U.S. App. LEXIS 28980, at *3–4 (6th Cir. 2021) (citing cases) (order). This is consistent with the Act's legislative history in which "[t]he Senate Judiciary Committee explained that § 3582(c)(1)(A)(i) 'applies, regardless of the length of sentence, to the unusual case in which the defendant's circumstances

5

are so changed, such as by terminal illness, that it would be inequitable to continue the confinement of the prisoner.'" *Hunter*, 12 F.4th at 570 (quoting S. Rep. No. 98-225, at 121).

Although the policy statement in § 1B1.13 is inapplicable when "an imprisoned person files a motion for compassionate release," *Jones*, 980 F.3d at 1109, the Court may still "consider [it] as part of its discretionary inquiry into whether a case presents extraordinary and compelling reasons for release." *United States v. Tomes*, 990 F.3d 500, 503 n.1 (6th Cir. 2021). Here, both parties agree that the Court should consider it. (ECF No. 2, PageID.15; ECF No. 8, PageID.81.) Application Note 1 to § 1B1.13 contains four categories of extraordinary and compelling circumstances, including the age and health of the inmate. Certain provisions, however, do not apply here because Dixon is not suffering from a terminal illness or has not served enough of his federal sentence. *See* § 1B1.13, n. 1(A)(i) and (B). So both parties focus on the provision involving a defendant "experiencing deteriorating physical or mental health because of the aging process . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." § 1B1.13, n. 1(A)(ii)(III); (ECF No. 2, PageID.19–20; ECF No. 8, PageID.83.)

According to Dixon, his advanced age, combined with his health conditions and the BOP's inability to manage them, constitute extraordinary and compelling circumstances. (ECF No. 2, PageID.22; *see also id.* at PageID.24 (Dixon describing himself as "a frail, sick inmate who cannot be managed in BOP").)

6

For starters, Dixon's age is not enough. After Dixon had been sentenced to life imprisonment in state court, a federal judge sentenced him to serve another 40 years consecutive to the life sentence. The message was clear: Dixon was to spend his life in prison. In other words, it was contemplated that he would be incarcerated into his old age. So this is neither extraordinary nor compelling. *See United States v. Mukunda Dev Mukherjee*, No. 4-cr-50044, 2022 U.S. Dist. LEXIS 122867, at *10–11 (E.D. Mich. July 12, 2022) (denying motion for compassionate release for 80-year-old defendant with diabetes, kidney disease, hypertension, and respiratory disease because his 328-year sentence was "intended to accomplish a life sentence").

But what about his age combined with his health conditions? Dixon advises that he had relatively few health problems for most of his 46 years in state custody. (ECF No. 2, PageID.18.) That changed, however, when he got COVID-19 in 2020. Now he says he is suffering from the effects of long-COVID—primarily vertigo, which caused him to fall recently and hurt his head and hip, and a skin condition that has caused chronic itching. (*Id.*)

Dixon filed his motion on January 29, 2023. There is nothing in his 2023 medical records that reveal a head or hip injury following a recent fall.[1] The records

---

[1] Dixon says he is still unable to walk and is fully dependent on his cellmate to move around because he has not been given a wheelchair. (ECF No. 2, PageID.22.) This appears to be based on a December 8, 2022 email that his daughter sent to the prison after Dixon reported a recent fall to her. (ECF No. 2-1, PageID.60.) But Dixon was treated on December 30, 2022 for a boil. (ECF No. 9-6, PageID.101.) He had "no other complaints or concerns." (*Id.*) He appeared well, alert, and oriented. (*Id.* at PageID.102.) He does suffer from anemia and was hospitalized in early January 2023. At that time, he "ambulated with minimal assistance from quad cane." (ECF No. 9-7, PageID.475.)

7

do, however, include a vertigo diagnosis. (*See, e.g.*, ECF No. 9-7, PageID.492.) They also make clear that, in addition to anemia, Dixon's most significant medical ailment is a severe skin condition, including lesions and a rash. This has resulted in persistent itching. Dixon's constant scratching also results in occasional bleeding. For example, on January 10, 2023, Dixon scratched a large itching vein on his left foot and it squirted blood. (ECF No. 9-7, PageID.461.) But Dixon is not suffering from anything terminal, untreatable, or even out of the ordinary for someone of his age.

Still, Dixon believes the BOP is not up to the task of caring for him. He relies on a 2016 report from the Office of the Inspector General, *The Impact of the Aging Inmate Population on the Federal Bureau of Prisons*. (ECF No. 2, PageID.18.) In this report, the OIG "found that limited institution staff and inadequate training affect the BOP's ability to address the needs of aging inmates." (*Id*.) The report referenced health care staffing shortages, long waiting periods for care, and restricted access to care outside the institutions. (*Id*. at PageID.20–21.) While these findings were undoubtedly accurate as of 2016, they do not tell the story of every individual facility and every elderly inmate. Indeed, if the BOP felt it was incapable of taking care of Dixon, the Warden could have simply granted his request for compassionate release. Instead, he apparently conferred with Dixon's provider who felt Dixon's age-related conditions did not substantially impact his ability to function at the facility. (ECF No. 9-5, PageID.100.)

Dixon pushes back. He says his "experience at Hazelton has been consistent with the OIG's findings" as "[h]e has requested and not received appropriate medical

8

care." (*Id*. at PageID.21.) But this is belied by his medical records. Throughout 2022 and early 2023, Dixon was repeatedly evaluated by doctors and nurses. (ECF Nos. 9-6, 9-7.) His wounds, scabs, and other conditions were treated with pressure, dressings, and different types of medications. (*Id*.) Some medications worked, and some did not. (*Id*.) When some stopped working, others were tried. (*Id*.) And when warranted, Dixon has been sent to the hospital for his skin conditions and anemia. (*See, e.g.*, ECF No. 9-6, PageID.111, 151; ECF No. 9-7, PageID.470.) After his treatment, he is almost always reminded to follow up with health services as needed. (ECF Nos. 9-6, 9-7.) Indeed, on January 30, 2023, the day after this motion was filed, Dixon was seen in the housing unit for a follow-up on his skin condition. (ECF No. 9-7, PageID.457.) He denied any open lesions or any pain at that time. (*Id*.) He also denied weakness or falls. (*Id*.) The staff modified his medication dosage and again advised him to follow up with health services as needed. (*Id*.) The Court sees nothing in the medical records that conveys an institution incapable of, or unwilling to, treat and manage Dixon's medical conditions. *See United States v. Walker*, 2022 U.S. App. LEXIS 25634, at *3–5 (6th Cir. 2022) (inmate's lingering breathing issues following his COVID-19 infection did not constitute an extraordinary and compelling reason for compassionate release where they were treated and managed by the prison); *United States v. Molina*, No. 15-cr-31, 2021 WL 1323402, at *2 (E.D. Va. Apr. 8, 2021) ("[I]t is generally true that 'chronic conditions that can be managed in prison are not a sufficient basis for compassionate release.'").

9

Nor do the records portray an inmate presently incapable of taking care of himself, or, when needed, receiving care from others.

Dixon disagrees with this in his reply brief. (ECF No. 12.) He apparently did not have his medical records at the time he filed his motion. So he uses the reply brief to address them. The Court, though, is not going to consider arguments about medical conditions raised for the first time in the reply. For one, this is improper, s*ee Sundberg v. Keller Ladder*, 189 F. Supp. 2d 671, 682–83 (E.D. Mich. 2002) ("[I]t is not the office of a reply brief to raise issues for the first time." (citing *United States v. Perkins*, 994 F.2d 1184, 1191 (6th Cir. 1993))), and for another, Dixon does not need his medical records to know the conditions he is being treated for.

In any event, Dixon believes the medical records show his care has been "ineffectual." (ECF No. 12, PageID.548.) But the fact that the treatments to date have not cured Dixon's skin condition does not mean he is receiving improper care. And it does not mean he is unable to be functional in the facility. But Dixon goes on to stress the dangerousness of his conditions: that his heart condition can cause vertigo, vertigo can cause falls, falls can result in excess blood loss given Dixon's skin condition, and excess blood loss could be fatal if Dixon is not discovered by prison staff. (*Id*.)[2]

---

[2] During a telephone call on May 11, 2023, Dixon advised his counsel that he fell last month and suffered a concussion and injuries to several parts of his body. (ECF No. 12, PageID.548.) It is clear, however, that Dixon was treated. In fact, he was sent to the hospital. (*Id*.) No hospital records have been provided to confirm the extent of the injuries. And no prison medical records have been attached to reveal the nature of the care provided. But given that Dixon was sent to the hospital, this was not a situation where prison staff failed to discover him.

10

This speculative chain of events does not create an extraordinary and compelling circumstance. Dixon's medical records are not replete with falls, or instances of excessively bleeding skin, or a failure to discover Dixon. In fact, the one fall documented in the medical records did not occur at Hazelton. (ECF No. 13, PageID.555 (sealed).) When Dixon's skin bleeds, the prison staff addresses it. And when he needs greater care than the facility can provide—including when he was injured in a fall last month—he is sent to the hospital.

Therefore, while the Court is sympathetic to Dixon's age and health conditions, his circumstances do not rise to the level of being extraordinary and compelling at this time. As a result, the Court need not evaluate the sentencing factors under 18 U.S.C. § 3553(a).

### III.

For these reasons, Dixon's motion for compassionate release is DENIED WITHOUT PREJUDICE to refiling should there be a future deterioration in his condition.

IT IS SO ORDERED.

Dated: May 22, 2023

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE